Your argument next in No. 2010-51-46, Turner Construction v. United States. TURNER CONSTRUCTION v. United States. Mr. Edelstein. Again, when you're ready. Thank you. Good morning, Your Honors, and may it please the Court. My name is David Edelstein on behalf of Appellant BL Harbert, Brassfield & Gorey. I'm here with Larry and Susan Schor of my firm. This case arises out of an organizational conflict of interest. On an Army Corps of Engineers construction contract of more than $300 million. Since 2007, AECOM served as the Corps' design consultant. Turner submitted a proposal for this contract with Ellerbe Beckett as its design subcontractor, and that team was awarded the contract. Within 30 days of contract award, AECOM announced that it had acquired Ellerbe Beckett. The result of this is that AECOM is now performing a significant subcontract on a government contract for which it helped write the specifications and evaluate offerors. And so in your view, what's the trigger for this OCI issue that you're raising here? Is it that there are some negotiations ongoing in terms of an acquisition that that's sufficient, even if the participants in the contract deal have no idea that that's going on? What's the trigger? I believe that that is the trigger, Your Honor. So if there are any kind of negotiations, even if 14,000 people are bidding to acquire some other company, 14,000 entities, one of those entities has some people in the contract review process that's sufficient. I'm not trying to challenge you. I'm just trying to understand what the trigger is. I understand that, and perhaps we should look at what actually was the case here. This was not a case where there were 14,000 bidders. This was a case where there were active acquisition negotiations occurring between AECOM and Ellerbe Beckett at very significant times in the procurement. For instance – So do you treat Phase I and Phase II as being equally offensive from your point of view? I do, Your Honor. The first stage, there was going to be an auction. A number of people were interested, correct, in the first stage? I'm sorry, Your Honor. Are you speaking about Phase I and Phase II of the contract? Yeah, of the attempts of the sub of AECOM to acquire the Turner sub. Yes, I do treat those as equal, Your Honor.  July 24th and 25th of 2008, we have the AECOM senior vice president, who is the principal in charge on the CORS design contract, in a room with the Ellerbe Beckett management discussing the potential merger of AECOM and Ellerbe Beckett. A few weeks later, he's at a design charrette discussing the CORS needs, preferences, likes, and dislikes. That design charrette occurred in September 2008. At this point, AECOM actually had an offer on the table to acquire Ellerbe Beckett and was actively engaged in negotiations. This was not at this point just a mere expression of interest or just 14,000 bidders. This was an actual live offer on the table and active negotiations, while the AECOM principal in charge is participating in high-level meetings with the CORS to essentially set the ground rules for this procurement. Talk about the CORS likes and dislikes. Our cases allow for a kind of Chinese wall, right? I'm sorry? Doesn't our case law allow for kind of a Chinese wall? There's a wall built between the people involved in the review process and the people involved in the business negotiations? It does, Your Honor, but it requires that that wall be set up in advance, that that wall be subject to monitoring by the CO, that that wall be disclosed to the CO at the time. For instance, in the Axiom resources management case, and it was a different scenario, but one of the things this court looked at was that Lockheed had submitted its mitigation plan along with its bid and the contracting officer had reviewed it, approved it, and that was subject to monitoring by her. What are we to make of the confidentiality agreements that were in place at least early on so that the contracting officer didn't even know between whom the wall should be built? My understanding was that they were unable to disclose, you know, which subsidiary it was that was involved. That's a good question, Your Honor, and I think there are two answers. The first is that the contracting officer doesn't necessarily need to know between whom the wall must be built. In July of 2009— It can't be monitored unless—if the contracting officer says, I think you need to build a wall and I'd like to monitor it, but I don't know where you built the wall, how are you going to be able to monitor it? Because, Your Honor, the wall is built between and among the AECOM personnel. If the contracting officer had submitted or had asked AECOM— What happens if the review by the contracting officer later determines that there was no foul with regard to the AECOM personnel? They interviewed them all and found, well, nobody either had any bad information or transferred any bad information. It was just, you know, pure as a driven snow. Your Honor, I think that's why the FAR draws a distinction between finding actual conflicts of interest and strictly avoiding even the appearance of impropriety, strictly avoiding significant potential organizational conflicts of interest, and mitigating significant potential conflicts of interest prior to award. When was it? Remind me when it was exactly that Turner first shows up on the scene? When did they first express an interest in the involvement in this? Your Honor, I'm not certain if Turner per se was there, but on August 7th, 2008, there was an industry day that was held. Right. That was just basically anybody that's interested come show up. That's right. And present at that industry— Before that, there had been no indication that Turner, EB, or anybody else is potentially involved in this contract, right? Not that I know of, Your Honor, but that industry day, August 7th of 2008, is essentially right in the middle of the AECOM-EB negotiations. Okay. So there's this general industry day that takes place. When is the first time that Turner or EB identifies itself, other than being among the crowd that shows up at this industry day, as being specifically interested in this contract? Your Honor, I'll refer you to the timeline that we have on page 5 of our reply brief. All right. And that is October 3rd, 2008. Phase I proposals are received. In these Phase I proposals, Turner identifies itself as the prime contractor and specifically identifies LRB Beckett as the design subcontractor. Now, that's the red on top of that timeline. The green on the bottom is the timeline of the AECOM-LRB Beckett negotiations, and you'll see that October 3rd, 2008 falls after AECOM had submitted an offer to LRB Beckett and before, according to the accounts given by AECOM, that initial round of negotiations was terminated. So we had an open offer on the table, active negotiations, and a Phase I proposal from Turner that identified LRB Beckett as the subcontractor. And this is why we say that July of 2009, when the contracting officer actually did discover or was finally informed that there might be a potential conflict, was by no means the earliest or as early as possible in the procurement process, which is what's mandated by the FAR. In August of 2008, or in October of 2008, she had simply asked the principal in charge from AECOM if there were any relationships with any of the identified contractors or subcontractors that might give rise to a potential organizational conflict of interest. She would have found out about this, and she would have, at that point, been able to put into place a Chinese wall that she could monitor. But the fact is that she didn't do that. The contracting officer waited until February of 2009, which was, at that point, AECOM had been performing for almost two years. That was the first she sent an email to the AECOM principal in charge asking for AECOM's assessment of if there were any relationships with these subcontractors. And at that point, it fell conveniently within the small break in the AECOM EB negotiations. So AECOM identified none. But she had done no investigation prior to that. She hadn't asked if there were any OCIs throughout the entire performance of the AECOM contract. How does this work as a practical matter? You've got a large company, and it's got subsidiaries. I mean, let's talk about the first phase. So every time a company is in some sort of negotiations, even if it's just, I'm going to submit a bid of an auction along with 5,000 other people, is it incumbent upon them to disclose that information, even if it's confidential, to all of its employees who might be involved in any contract review or any contracting thing? I mean, how does this sort of get shepherded in the first instance? I mean, presumably you would agree, right, that they just didn't know. It was not like they knew that AECOM was in negotiations and they intentionally withheld it. It's more likely that they just didn't even know, right? Your Honor, I actually would disagree with that. I mean, I won't ascribe evil motive to anyone, but this AECOM— Well, let's assume they didn't know. But this AECOM senior vice president, the principal in charge, was actually on the AECOM team that went to a meeting in July in Minneapolis, I believe. July of 2008? July of 2008 to help analyze the AECOM-EB potential merger. So he did know that these negotiations were on. That individual was Chinese Wall eventually, correct? Eventually, Your Honor, yes. But if you look at the wall that was put around that individual, that was put around him in July of 2009, at which point the only of the three types of OCIs that could have been at issue going forward was an impaired objectivity OCI. Essentially, the CO walled him off to say, you won't be part of the process of evaluating offerors going forward. But that wasn't the OCI that the GAO found. GAO found an unequal access to information and a biased ground rules OCI. On your earlier analysis, you said, well, the contracting officer could have figured some of this out back in the summer of 2008, right? Yes. And the contracting officer should have said, let's have a Chinese wall and I can monitor it. Then when the negotiations faltered, you said, when you get into this no man's land, what happens in the real world in the RW? Does the contracting officer tear down the Chinese wall? So you don't need it anymore because you're no longer negotiating. I'm trying to get at, I mean, you're talking, we're talking about a sequential set of events that you wanted to have happen in your view here. And when the contracting officer was aware that there had been these ongoing negotiations, they said, ooh, well, somebody may smell the fox in the chicken coop here. Let's make certain that doesn't happen. So you do the walling off. And then AECOM comes in and says, well, we've got all these restrictions on our employees for walled off and whatnot. Can't we release them from that burden? Because we're not negotiating with this company anymore. Don't you tear the wall down then? You may be able to. And then you're going to have to rebuild the wall when they say we're going to, we're thinking about cranking up the negotiations. Well, Your Honor, I think. And then the negotiations falter, so you tear the wall down. Your Honor, I think the issue that I'm taking with that hypothetical is that it's actually based on a contracting officer who does know what's going on, that has this knowledge, that has done what the FAR mandates in terms of an identification and analysis, I'm sorry, identification and evaluation of OCIs as early as possible in the procurement process. There wasn't, I take it, anything that the contracting officer could or should have done in July of 2008, right? Because the contracting officer has no idea who is going to show up as in the first submissions, right? Your Honor, I actually would disagree with that. The FAR requires that the contracting officer even evaluate, I'm sorry, even planned acquisitions for potential organizational conflicts of interest. I don't know who was potentially there in July. Because, Your Honor, the Corps was contemplating a design-build contract, which meant they knew that their offeror teams were going to consist at minimum of a GC and a design subcontractor. And they also knew that they had a design contractor as their design consultant. The potential for an OCI here is obvious, and the CO's job. No, but I think Judge Bryson's question I understand is that Turner didn't apply for the contract. He didn't respond to the proposal until October. So how would the contracting officer have known to start looking at conflicts when they didn't even know that Turner was going to be in the process? Because the contracting officer's job is to monitor for potential conflicts of interest.  There might be 40 potential bidders in the initial instance. I mean, are they supposed to scour the universe of people they think might submit bids and then start investigating OCI's with respect to all the potential bidders, even though at the end of the day only four firms here actually submitted a request? Your Honor, I see my time has begun to expire. I don't believe that the contracting officer needs to scour the universe. But when certain potential offerors present themselves at an industry day, and then again when they actually submit bids that identify the design subcontractors. The initial bid was submitted in October. I'm talking about the difference between July or June versus October, why she would have had to do anything before October. That's the question, I think. Because the offerors to a degree identified themselves in July. July or August? I thought the industry day occurred in August. I'm sorry. You are correct, Your Honor. It was August. July was the meeting. She should have looked out there. There's a crowd of people sitting there taking notes and so forth. She's supposed to look out there and say, Now, who are all these people and let's do an OCI determination with respect to all of them? No, but she should at least, Your Honor, ask the already existing design consultant, AECOM, you've seen who these people are. Are there any relationships that you have with these potential offerors? And she waited to do that until February of 2009. May I just briefly conclude, Your Honor? Why don't you answer Judge Sparvich's question first? Because we haven't talked at all about the post-protest investigation. Okay. And I'm certain that Mr. McCaleb is going to talk to us about it a great deal and I want to just open the issue so that you'd be able to rebut. You make an argument that it was error. Your error is a matter of law for the court of federal claims to rely heavily on the post-protest investigation. Right? Yes, Your Honor. Because your point is that before the post-protest investigation, the CO didn't have much of an explanation about what she should or should not have been doing. That's correct, Your Honor. And the GAO, this comes procedurally to this court. This had been a protest to GAO that was sustained. Then when the court implemented GAO's recommendation, Turner protested to the court of federal claims which overturned the CO's decision to implement the GAO recommendation. And this court's precedent is well settled that if that GAO recommendation was rational, then the CO's decision to implement it must also be found rational. Now remember that when GAO was analyzing this issue, what GAO was analyzing was the Army's award decision which happened in September of 2009. And prior to that award decision, the CO knew nothing of what is found in her post-protest investigation. She made that award decision which GAO was analyzing on the basis of essentially about two pages in the record which reveal no investigation whatsoever and no knowledge of any of these facts that Turner and the court of federal claims now relied on to support her decision. Thank you, Your Honor. Thank you. We will restore a couple of minutes of rebuttal time if you need it. Thank you. Thank you, Your Honors. May it please the court. I'll start where Mr. Edelstein left off with the post-protest OCI analysis of the contracting officer. The court's task, the court of federal claims task here was to evaluate and analyze the reasonableness of the Army's decision to follow GAO's recommendation. There is no question, it's undisputed that the CO's OCI analysis was before the Army at the time that it made the decision to follow GAO's recommendation. The court of federal claims as part of the process of analyzing the reasonableness of that Army decision was tasked with also looking at the rationality of the GAO's decision. It is likewise undisputed that it was before the general government accountability office at the time it made its decision that CO's OCI analysis was before the GAO at that time. GAO was fully aware that the CO's OCI analysis was prepared in response to the protest. GAO invited and accepted that OCI analysis. In fact, GAO requested that the parties provide comments, all of the parties provide comments on the CO's OCI analysis. But it never really relied on that. That was part of what the court of claims had a problem with. It never engaged the CO's rationale and that was the error. On each of the three central issues that was before GAO, whether there was an alignment of interest at any time during the procurement process, whether there were facts sufficient to create a bias ground rules OCI, and whether there were facts sufficient to create an unequal access OCI, on each of those, as the court of federal claims properly held, the GAO failed to engage the CO's analysis. In fact, they just, as in the words of the GAO, they simply said, we disagree. The one way of looking at your adversary looks at the post-protest analysis by the CO was to say, well, the CO proved that there was no actual conflict. No foul. The fox may have been in the chicken coop, but he didn't eat any chickens. Okay, I think that's basically your adversary's argument. So they say, well, the fact, what about the appearance of conflict? Well, I mean, if you have a situation where a turner is in there and submits a bid for the contract, at the time it submits the bid for the contract, it's 99% of the way home to buying up, I mean, pardon me, the e-com is up to buying up the sub, and the interests are aligned, aren't they? Wouldn't one of, in post-Watergate morality, see everything crooked? Wouldn't one walk up and say, well, gee whiz, if the person that's helping the government figure out what should be in the contract is about to acquire one of the contractors, isn't there an interest there to do something to make sure that the company you're about to acquire gets the contract? Your Honor, that absolutely is not what happened here. What happened here is that after the contract was, even two days after the contract was awarded to Turner, EB's board of directors refused to even authorize a merger at that time. So, now, on the appearance issue, I'll switch gears. Yeah, but you don't need, it doesn't matter in this case, does it, that EB was actually ultimately acquired or not acquired. I think the other side would still be here, even if EB had been picked up by somebody else. The question is whether or not there were negotiations going on for the purchase, right? That's the question that GAO answers and the question that Harvard advances. But the question that the Court of Federal Claims was analyzing was the question of whether or not the Government Accountability Office's decision was rational. And in analyzing that issue, the Court of Federal Claims properly concluded that on each of those three central questions that I mentioned, it simply failed to engage the CO's OCI analysis and instead simply substituted its own judgment based on innuendo and suspicion. No, but hypothetically, if all of the folks engaged in this contract review knew that there were negotiations going on for the purchase of EB, but even if at the end of the day those negotiations fell apart, there would have had to be some disclosure, right, and there'd be some OCI problem. I don't think so. And the reason I say that, Judge Prost, is at the time that the contracting officer, at the time these negotiations are going on, and there are two distinct periods, right? So you have the period in the fall when HSM's parent, AECOM, is involved in a multi-party auction where it's not even the highest bidder. This is 2008. This is 2008, and the auction terminates before HSMM has to provide even its first bit of advice or RFP material to the Army. It had done nothing before that point providing any material to the Army as part of the Phase II RFP. Just to be clear, we were talking about the October date. I mean, at least there's an intersection. October, November. Right. There is that intersection of the period where they're involved. That's right. Okay, so you've got a month to deal with there. So the question is, and the argument that you've heard harbored advance in its briefs in here today, is that at that time there was a, quote, facially obvious OCI that the contracting officer had an obligation to address. That, quote, glaring OCI that the contracting officer was supposedly obligated to address is an OCI that not a single GAO case, not a single Court of Federal Claims case, and not a single Federal Circuit case has ever found to exist. There is not a single case, except for the GAO's decision in this case, that suggests that the mere participation in a multi-party auction that ends before HSM even has to provide materials to the government, somehow creates an OCI that the contracting officer is obligated to address. Indeed, the – but even if there were – Well, is that result relying on the kind of negotiations that are going on? Is that because it was a multi-party auction as opposed to one-on-one and there were already offers? No. What's the criteria then that we rely on? The criteria go to the very GAO cases that exist on this. And what the GAO cases look for is whether there is the extent of the relationship between the two parties and whether there is a direct and tangible financial benefit that would flow, not an attenuated and a potential benefit. And that's what the GAO case law recognizes as the – The benefit between HSM and EB. Between HSM and EB. Is there a tangible direct financial benefit between those parties? In that – so where the case law – That argument would lead you to believe to say there's no direct and tangible financial relationship until the deal is actually done. That's right. Until the deal is closed. That's right, Your Honor. What about – And that proceeds, I assume, from the theory that ECOM, while it might want to feather the nest in favor of EB if it actually acquired them, it certainly wouldn't want to feather the nest if somebody else bought them. That certainly is true. And the point is that that's entirely consistent with the only case law or the closest case law that we've been able to draw an analogy to, which is the federal district court case law in the area of common interest privilege invocation. And in those cases, what the courts have uniformly said is that the mere participation in either merger discussions or negotiations over a commercial enterprise or commercial deal do not alone create a unity of interest. Well, but you wouldn't want to take a really hard line on that, I don't think. I'm sorry, Judge Bryson? You wouldn't really want to take a hard line on that point. It seems to me there's a big difference between an auction with multiple players and an arrangement that everybody assumes quite predictably will turn out to be closed and something occurs a week before the closing, and that would be a different case. I understand, and I don't think we have to take that point. I guess the point that I was trying to make is to let you know where the case – one contractor that has conflicting roles, that can certainly create an OCI. There's also a case law that says affiliated contractors, if they have conflicting roles, that can create an OCI. And so they're all fact-specific inquiries, but we don't have any cases. We don't have a single case that suggests that just because you're having discussions over a potential merger, that that could create – that creates an OCI that has to be addressed. Now, to go back to the question I asked of your opposing counsel, did this – I'm interested in when exactly and in what way EB's presence here manifested itself during the 2008 period. I take it the earliest that anybody can say EB was even in the picture was in August? The industry day. Industry day. That's right. And there is a – I think there's a kind of a fundamental misapprehension about the timing and what's going on. This procurement, the design bill, proceeded in a phase A, a phase I, and a phase II. The effort that HSMM was performing was in relationship to phase II. It was not in relationship to phase I. It had no role in phase I. What it was doing was assisting the government with preparing the phase II RFP, and then it was going to assist the government in supporting an initial review of proposals. That was not – it wasn't the phase I RFP that the government – that HSMM was involved with. Which brings us to phase II then. Which brings us to phase II. Okay. And so with respect to phase II, so what happens in phase II? The contracting officer did exactly what she was supposed to do. The contracting officer in February of 2009, which is two months before the phase II RFP even issues, which is in April of 2009, the contracting officer goes to HSMM, and they are part of a JV with another company called HOK, and says, okay, do you have any relationships with any of the companies that have been selected to participate in phase II? And they say – and HSMM says no. HOK says, well, we have a relationship, teaming relationship with GORI, who is one of the JV members of Harvard's team. And so – and that was exactly what she was supposed to do. And consistent with the obligation that's stated in the FAR to avoid unnecessary delays and excessive documentation. That's because the merger talks or discussions or the interest of HSMM and EB is neutralized at that point in time, right? I wouldn't call it neutralized. I'd call it terminated. They had terminated at the end of November in 2008. There were no negotiations going on. And so what happens next is that the – excuse me, HSMM concludes its effort in assisting the government to prepare the RFP. That effort concludes in April of 2009. It is not until June 2009, two months after the effort to help prepare the Army's RFP is concluded, it's not until two months later that the four executives from each of the companies, EB and HSMM – I'm sorry, and AECOM meet to even talk about whether they want to pursue a potential merger. And it's only two months after the conclusion of that RFP preparation effort that that even begins. At that point in time, as you go forward from there, there – so there can be no biased ground rules OCI. The facts do not permit. They simply don't permit a biased ground rules OCI to be found. It can't happen because the RFP was prepared during a time when there were no merger discussions that were ongoing in any way, shape, or form. Can I ask you to shift gears and talk about the scope of the injunction issue? Sure. I'm troubled about the question of whether, inasmuch as I understand it, you did not pursue a challenge to the termination for convenience, but rather chose to litigate this in the context of the re-procurement exclusion. Of course, yes. That's correct. And the question, then, is why is it appropriate for the trial judge to have entered an injunction that effectively grants you injunctive relief with respect to your termination, in effect, as opposed to simply confining the injunctive relief to the 1491B type remedy? Sure. I think I can clear this up pretty easily for you. There's no dispute here that jurisdiction attached under 1491B1. Sure. Everybody understands that. But as to what is the question, of course. Yeah. And yes, Your Honor. And there's likewise no dispute that the ability to issue declaratory and injunctive relief or any relief in a bid protest before the Court of Federal Claims is found under B2. And the language is that the Court of Federal Claims can award, quote, any relief the court considers proper, including injunctive relief. This Court's Parcel 49C decision says that injunctive relief is appropriate if it enjoins the illegality of the illegal action and returns the contract award process to the status quo anti any illegality. That's exactly what the court did here. Precisely what the court did here. Before the Army wrongly followed the GAO's irrational decision, it had already been. Well, it depends on what the status quo as to the illegality that is the subject of the dispute. That's right. The subject of the dispute here was the exclusion of Turner. The status quo anti before the exclusion of Turner is that Turner gets to be in the re-procurement. Why not? Why not is because would Turner – the status quo – I know you're much better off if you can obtain a judicial order reinstating you as opposed to relying on the government to reinstate you, which I gather it's free to do. Am I right about that, by the way? Assuming that we were to say, no, no, the Court of Federal Claims went too far with the injunction, should have just said that GAO got it wrong with respect to the re-procurement. The government could say, well, we're going to – in that case, we will reinstate Turner. They could do that, right? The answer is yes. The answer is yes, 49102D. Okay, but they wouldn't have to. So what you want is the guarantee through the injunctive release that you've obtained from the Court of Federal Claims that the government will put you back because they have to. I think there's a misapprehension of what happens sequentially. Okay. So the government accountability – I'll do my best, Judge Bison. The government accountability office issues its decision. It is a recommendation. It's a recommendation by statute. And so the government has an obligation to determine are we going to follow that recommendation or not. So it is – respectfully, I don't think it's the case that at the point just before the illegality, which is the time at which the court – I'm sorry, that the Army decides to follow the GAO recommendation. I don't think it's fair to say that the status quo at that time is that Harvard doesn't have the award any longer and it's just going to be one more competitor in a potential re-procurement because no decision has been made at that time about whether to follow the GAO recommendation. So the status quo right before the Army's illegal decision to follow the irrational GAO decision is that the Army had already determined Turner was the best value offeror, had awarded it the contract. It had the contract. The only appropriate remedy here, the only appropriate remedy is to restore the contract award process to that exact point in time, the point in time in which they still had the award, they were still the best value offeror, and that is what respectfully our position is, the status quo ante was, that the court of federal claims ordered the reinstatement for. I will also say, and I think it's a very important issue, and that is, I think this was a plainly waived argument. Let me ask you about that because you do emphasize the waiver in your brief, it's your lead argument, but I'm just a little unclear as to when the obligation to raise an objection to the scope of the injunction came up. You know, this isn't, it's not as if they had an argument which they failed to make and therefore waived. It is that there was a form of relief which wasn't granted, obviously wasn't in play until the trial judge entered an order against them and granted that relief. Now you, to be sure, you had asked for that relief in your complaint. Five times your relief. Were they obligated when that relief had not yet been granted to make a point in their brief? And by the way, if you rule against us, please don't. But if you do rule against us, don't grant the relief, one of the items of relief. Very fair question, Judge Bryson. The briefing on these cases, and it's in all of these court of federal claims cases, because they're all, every plaintiff is asking for injunctive relief. So in every one of the briefs in any of these bid protests that are properly prosecuted, you start off, obviously, with the likelihood of success on the merits, and then you go to the balance of the harms and to the public interest. So in all of the briefings, in three briefs that we submitted in support of our case and in our complaint, we said that what we want is the contract reinstated, the status quo ante, the illegality restored. If either the government or Harvard or the other protester, GAO, who intervened at the court of federal claims, McCarthy Hunt, if any of them thought that either the court lacked jurisdiction to grant the requested relief or that there was a limitation on the court's equitable authority to do that, they had an obligation to tell the court in that briefing. It's not like we briefed this one time. Well, we raised the issue on the motion for the stay. That's true. Yeah. That's true. And Judge Fute said he pointed out that that was the first time that they raised it. That's right. And so the waiver might not attach from the date of your complaint because of failure to complain about relief that wasn't even been granted. I mean, your point, I suppose, is the waiver attached during the time period when you were asking and the court was considering and was about to grant the relief. Based only on this court's long line of cases that says that the failure to raise an issue in the initial brief on the merits below at the trial level constitutes a waiver. Well, let me . . . maybe I misapprehend the sequence of events. Sure. But I thought that Judge Fute entered his ruling on the merits and his injunction in the same order so that there wasn't . . . it's not as if he said, okay, Turner wins this case. Now, let's think about what form of relief ought to be entered, right? That's fair. He issues the opinion. He issues an accompanying order. Same day, same time. Right. That's the first that Harvard finds out that it loses the case and that the injunction has been granted at the same time, right? It's true, but it's not . . . So the first time post the entry of any kind of order adverse to them that they can say anything is in the motion with respect to the stay. It's the first time after the order is entered. It's our position that they had an obligation to raise it before that. Okay, I understand. I'm way over time. I'm happy to address any other questions the court may have or we can rest on the briefs. I think we're ready to move on. Thank you, Your Honor. We request a permit. Can I have several minutes for a moment? You may have . . . Yes, we gave Mr. McKim several extra minutes, so let's give you three minutes if you need it. Thank you, Your Honor, and perhaps I can take my three minutes to rebut three brief points. The first is Mr. McCaleb's initial point regarding the CO's post-protest investigation, which was, in his telling, before the CO properly . . . before the Court of Federal Claims properly because it had occurred prior to the decision to reinstate . . . I'm sorry, prior to the decision to follow GAO's recommendation. But one of the Court of Federal Claims holdings, which was unchallenged on appeal by Turner, is that the CO had no obligation to conduct a reevaluation of the GAO decision, and that's consistent with significant and longstanding precedent from this court. If a GAO decision is rational, then an agency decision to follow that GAO decision must also be found rational. The CO can't create an additional record . . . How does the CO decide if the decision of GAO is rational? The CO doesn't. The CO does not . . . The precedent from this court with Honeywell and CENTAC is that the CO does not have an independent obligation to evaluate the rationality of the GAO decision. Does it just mean then that every GAO decision is presumptively rational? From the CO's perspective, yes. Every GAO decision should be followed by the CO. Presumptively? What happens if the GAO decision is totally wrong, no question about it, just facially wrong? Then a challenge can be brought to it. And the Army says, I have to accept that. I'm not allowed to examine. The only point that I was making from this, Your Honor, is that the fact that the CO created this record well after her award decision was made doesn't mean that that additional record should have factored into her decision to follow the GAO recommendation. Because when GAO recommendation came out, she did not have an independent obligation to make another decision to follow it. The second point that I'd like to address is Mr. McCaleb's argument that not a single case supports the relationship here giving rise to an OCI. He talked about L3 services. And I would like to compare the relationship in L3 services to the relationship here. A company called FCI had evaluated a proposal of a company that it worked with occasionally as a subcontractor. And GAO looked for whether there was evidence of a corporate relationship, evidence that FCI was making judgments that would otherwise directly influence its own well-being, and said that there wasn't a direct financial benefit. Well, here there is a direct financial benefit. AECOM was involved in the early stages of the procurement, and AECOM is now performing the contract. The fact that that direct benefit didn't become 100% certain until a few days after award, it doesn't impact the directness of it, and it certainly doesn't impact whether there's an appearance of an OCI. And finally, Mr. McCaleb said that the facts simply don't permit a finding of a biased Brown rules OCI because of the timing. I would like to look at the CO's secondary evaluation here in the event that this court does decide it should have been given some weight. And I'm on page 6070 of the joint appendix where the CO says that HSMM HOK assisted the agency in developing this different design concept by sending representatives to a design charrette in September 2008, by preparing a charrette report in October 2008, and by submitting a draft copy of the technical provisions in December 2008. So during that design charrette and during the preparation of the design charrette report, which were conducted by AECOM's subsidiary, there was an offer on the table and active negotiations. Those facts do support a finding of a biased Brown rules OCI. Thank you, Your Honors. Thank you. Thank both counsel. The case is submitted.